Walsh, 172103 Good morning your honors, may it please the court, I am the attorney at law and I represent defendant appellant Edward Walsh on this appeal. The key issue we'd like to discuss today is the fact that the government through agent Hosey interviewed the key witness in this case, who was Sheriff DeMarco, an astounding 40 to 50 times without taking a single note or disclosing to the defense anything that was said during those interviews, including anything of impeachment value or any exculpatory evidence. Are you saying we should infer that there must be something that would be Brady material just because there were so many interviews? No, I'm not asking strictly because of the number of interviews. I do think the number of interviews raises a very significant question about why so many. As anybody knows who sat in a proffer session or something like that, usually even a couple of interviews. These weren't proffer sessions, right? I'm not particularly inclined to quibble over your use of the word interview, but the government's position is that the witness here, the sheriff, was in effect a fellow officer, right? I mean an FBI agent might well talk to his partner hundreds of times in the course of an investigation. This was not a partner. This was an interview presumably in preparation for trial. This was not co-ordination. Where does it say in the cross-examination that these number of conversations were interviews in preparation for trial as opposed to interviews over the course of the investigation, as well as before trial, but at some point between the time that the sheriff first reported his concerns to the FBI, was first contacted by the FBI, and the time that he took the stand? Well, I shouldn't have said in preparation for trial specifically. What I meant was in connection with the investigation and trial in this case, the clear record is that there were 40 to 50 interviews. Your question, I believe, is a fair one, which is does that alone give rise to an inference? And I do think 40 to 50 is a tremendous amount, but there are more specific facts in this case that if I could address those as well, I think might help answer why this case in particular fits in to that Rodriguez footnote that says, you know, there may be a case one day where the ability of the prosecutors to disclose to the defense is so compromised by not taking notes. And here we have a number of things. First of all, we know that there was Brady material that wasn't turned over because there was an interview. DeMarco told the agent that his undersheriff, Myricks, had specifically told him that every time he had tried to reach out to Walsh, he was available. Myricks effectively ran the department and he also signed the timesheets. That was important. Another thing that we see is that Hosey takes notes of a number of other individuals who were not under investigation, does not take notes of DeMarco, and then he effectively lies about it at trial. Hosey also does... Can you explain that lie? What exactly do you mean by that? Hosey testifies, of course, there's a question of why aren't you taking notes? So he says, well, the reason I don't take notes is because it's my practice not to take notes of interviews of witnesses who are law enforcement witnesses who are not under investigation. And cross-examination shows one specific person, Vicky, I apologize, I don't remember the last name, it's in the brief, and a number of others who turns out he did interview and took notes. So it turns out pretty clearly that he's misrepresenting that. Who are those people? They're law enforcement in some sense? Yeah, they're members, and they're in the reply brief, if Your Honor wants, I can pull it up. Yeah, that's fine. I'll look in the reply. Wasn't DeMarco the driving force behind this complaint here? Isn't he the main hostile witness? How likely is it that there would be anything exculpatory in anything that he would say to the agent? Well, there's a point at which we don't know. Why is someone being interviewed 40 or 50 times if his story is not changing, right? You don't interview a busy sheriff of Suffolk County 40 to 50 times. Yeah, weren't some of these interviews phone calls between the two of them? There's nothing in the evidence to suggest that. The record is interviews. Not only specifically. The record is conversations, right? No. No. No. The word interview is there. Absolutely. And I'll point to my reply. I think some were interviews. No. I'll turn to page four of my reply brief. Question. Do you do remember never writing down one thing in your 40 some odd interviews of Mr. DeMarco? Correct? Correct. It's also in the context of that. Oh, that was your predecessor counsel's word, then, that in the course of a question, you don't object to the word interview in that? Wasn't the witness just saying, you want to call them interviews, we'll call them interviews? No. Is there anything more on the substance and length of these contacts? No. There's nothing on there on that, and I don't know that that's... I can see a scenario where DeMarco has a thought, and he calls Halsey and says, well, and there's also this you should know, and Halsey says, thanks very much, and they get off the phone. It's not just that. In our opening brief, we laid out the context of it. There's several pages where he's asking questions. That is the clearest example of that. Look, I'm up here on appeal, in which there's a record that says interviews. I think it should be fair to assume... that you want us to propound. Well, Rodriguez in footnote three says that in that particular case, it was turned over, it was disclosed that the witness had lied about everything. What they said is there may be a case in which the interviews, the ability of the prosecutor to turn over exculpatory or impeachment material is going to be compromised, may be compromised by the failure to take notes, and we're not going to decide that today, but in our case, we have several distinctions from Rodriguez. We have many, many, many more interviews. We have a situation where there's... There, it actually turned out that the witness said at trial, I lied the first few times or I lied about everything, so that actually gets disclosed. We don't have that at all. But here, you know, we have some evidence that there's a shifting theory, right? We... There's no sense at the beginning of this case that DeMarco's... Don't we need more than that? Well, at the beginning... Some evidence, and that's not equivalent with whether it's a lot of evidence, some evidence, no evidence, but some evidence, so we need more than that in this context. Well, there's no evidence about what was discussed in those interviews, right? The government never, once disclosed, even in its brief, what was actually said. We know Hosie is misleading, at the very least, about his practice. We know he's not following the guidelines as well. We know he doesn't disclose... What would be the rule going forward? In other words, what are agents supposed to do? It would have to be a rule that says you have to take notes every time you speak to a witness, wouldn't it? I mean, what else could we adopt? It's one thing to say retrospectively, in some case, there's some sort of problem. If that's doable, then what rule does that create? I appreciate that because I certainly understand that this is not a situation where the court wants to open the floodgates to anybody who says, hey, look, they met with this guy two or three times. I didn't learn what it is, and therefore, I want a reversal. But here, we have facts that I think the court can write a much more limiting opinion. We have 40 to 50 interviews. We have the fact that they're... At the 30th interview, at the 20th interview, when does the agent start taking notes? I'm not proposing a number. I understand that that's a slippery slope here. But what I want to do focus on is that there are additional facts here that suggest that the story was shifting. For example, Agent Hosey tested, one of the key issues of the trial was what was the discretion of Ed Walsh, right? The basic defense is, look, yeah, I'm outside the office, but I'm on the phone thousands of times. May I finish my thought or? Of course. Yeah, well, I need to ask. You know, I'm talking to him thousands of times. Yes, maybe I'm out on the course, but I'm doing work all day long, all the time. Now, so the key question is, what's his discretion? And a lot of that is based on the fact that he's an aide to the sheriff, which has sort of amorphous duties. Hosey testifies in the grand jury. He's an aide from the beginning, 2006, up through today. And part of that is based on, well, let me back up. DeMarco says, no, no, no, there's a memo here from 2006 that says for three months he was an aide. After that, he's not an aide. He's not allowed to leave his desk, right? That all comes up for the first time at trial. So what is Hosey basing his statement on, that he was an aide? Presumably, he's getting that from DeMarco. DeMarco's the only person who could have said that to him. So we have that as a shift. We have the fact that Hosey is misleading. We have the fact that Hosey did disclose at trial, but not before, it turns out, a piece of Brady material regarding what the undersheriff had told him about signing the timesheets, and why he signed the timesheets, and the fact that Rolfe was always available. You have no evidence in the face of an explicit government denial that there's, in fact, Brady material that goes to the issue relating to what led to your client's conviction. Is that right? Well, the one that came up at trial was that DeMarco had told Hosey, the agent, that his undersheriff had reported to him, and other high-level people in the office had reported to him, essentially, that Walsh was always available and was always there. And that was one of the key pieces of the defense, certainly, was that he was there. We'll hear from the government, and you've reserved two minutes for rebuttal. And you should feel free to discuss in your rebuttal if you want the issue relating to the ineffective assistance claim. Thank you. Good morning. My name is Catherine Mirabile. I'm an assistant US attorney in the Eastern District of New York, counsel for the appellee. I was also one of the assistants in the trial below. Addressing the Brady-Giglio argument, I first note that this was not an issue that was raised below in the district court. However, to the extent this court wishes to consider that issue, despite the fact that it was not raised below, there was no Brady violation. The government did not fail to disclose any exculpatory or impeaching evidence that DeMarco had made. And essentially, as the court acknowledged- You say it was not raised below. Didn't the district court actually, at some level, deal with the issue or reference the claim? This particular claim, no. Below, there were two motions for a new trial at the district court. The first motion dealt with whether or not DeMarco received a non-prosecution agreement from the government, which was certainly not the case. And there was an argument that the government had failed to disclose that they had a non-prosecution agreement with DeMarco, which was not the case. They also raised in that first motion that DeMarco committed perjury related to another particular issue that's not up on appeal. The second motion related to three other witnesses unrelated to DeMarco. That was Charles Ewald, Dan Papel, and Murnane. I forget his first name. However, Papel and Murnane both testified at the trial, and the defendants interviewed all three of those witnesses, two of which were called by the defense at trial. None of those witnesses, I should say, had any exculpatory or impeaching material. And to the extent that it was arguably impeachment, it was duplicitous of the other impeachment material that was elicited throughout the trial. Yes. One of the things that's making me just a little bit uncomfortable is that we're kind of shooting at a pig in a poke. We don't know what happened in those 40 to 50 interviews. We don't even know they were interviews. Usually when we have this kind of Brady issue come up in trial, the U.S. Here's what happened. Here's the information that was gathered. As you can see, it is not Brady and Giglio. Here are the circumstances. I'm almost tempted to remand for like a Jacobson hearing and have the district court develop the record a little bit more about what was said between them in this large number of contacts, however you want to characterize them. Sure. DeMarco was actually on the stand for an extensive period of time. He was on the stand for close to two days. He was cross-examined extensively about his communications with the government and the defendant's role at the sheriff's office. On the Fatico hearing, that's when the 40 to 50, if you want to call them, interviews was raised. That was first raised at the Fatico hearing. And the initial question was, how many times did you speak with Sheriff DeMarco? Not how many interviews. That was a question that was later asked by defense counsel and the agent just adopted the word interviews in responding to the question. But he initially said he spoke to the sheriff. And I note that the sheriff is the one that actually brought this case to the US Attorney's Office and the FBI. To say that the sheriff then was changing his story when he was the one that initially requested the subpoenas and brought this case, it makes no sense. The conversations, the communications were certainly, he had asked for a subpoena. That was discussed extensively during his examination, that he came asking for subpoenas to the US Attorney's Office. Conversations certainly revolved around the subpoenas, the subpoena responses, conversations about an investigation involved scheduling. So to call them interviews, I think, is a misnomer. Mr. Mirably, I thought the answer was going to be that the reason there's no record is that's why it matters that the issue wasn't raised in this form below. In other words, if there was a new trial motion that said, our problem here is that there were all these interviews and there were no notes taken. And we therefore think that this falls within the footnote exception and you should grant a new trial because of that. Then perhaps the government might have made a more fulsome response about what, at least the agent's version of what went on at these interviews was. Sure, but I think that there's sufficient evidence for the court to decide this and not remand this back to the district court. The failure to take notes was discussed fully and argued to the jury at the district court level. It was argued to the jury in summation. You might have been better off without the notes than with them, but we don't know that. Does it matter that Sheriff DeMarco had notes of these conversations that were made available to the defense? Or is the problem that those are just self-serving, so they don't serve the same purpose as the agent's notes? No, they were his 3,500. He was essentially a quasi case agent on this matter. And those were turned over as his 3,500 as his notes taken as part of the investigation. I would also note that the defendant was required to comply with the collective bargaining agreement, the CBA. And there's nothing that DeMarco could say in any of these alleged 40 to 50 interviews, if you want to call them interviews, that would alleviate those obligations from Defendant Walsh. I would say that he interpreted the CBA to provide that the defendant was totally at his disposal, right? He could say that. Certainly, but there's nothing in the CBA that would permit Walsh to golf, to gamble, to go on vacation out of state, to participate in conservative party activities. There is nothing in the CBA that would permit him to do that. He could do all of those things if he chose, but he couldn't record the time spent doing that as hours at work. Right, which is what he did. And that is what he was convicted of. If the court has any additional questions or any questions on the cell site location information. So I'm looking at, I'm just interested in your statement that this issue was not raised. And I am looking at the new trial motion from filed by Mr. Walsh on August 16, 2017. And it refers to the 40 or 50 notes. It then argues in the argument section, it makes an argument. And I'm not saying it's the clearest argument, but it does make an argument that references how Agent Hosey inexplicably failed to take a single note or to write one report of any of his 40 to 50 conversations with DeMarco in the context of a Brady argument. So why isn't that enough to have preserved the issue? The argument in that motion, the crux of that argument was related to Brady material from those other three individuals. No, I understand that, but you say the crux, but one small bit of the argument seems to be related to DeMarco's testimony and the fact that Agent Hosey failed to write a single report. Look, don't get me wrong, I think it's highly unusual not to have, even in the course of interviewing a single law enforcement officer, not to have even one memorialization of any of those documents, knowing that that's going to be likely to be your principal witness. But here it seems that he's preserved the argument. You're not saying the post-trial motion was too late to preserve the argument? No. No, Your Honor. So it's squarely, it's before us. Okay. Okay, yes. Oh, okay, you concede that it's before us. Great. Thank you. Mr. Marmer? Let me, I know you asked about the CSLI, but if I may just go back to Brady, because that may be the most fruitful argument I have here on appeal, given some of the intervening case law on the CSLI issue. I do think a hearing is probably the most likely, if I'm going to get a remedy from this court, I acknowledge that the court seems unprepared to reverse the conviction outright, and therefore a hearing would be appropriate. So I wanted to maybe tick off some things that a hearing might look like. First of all, we could determine whether these were interviews or conversations, hopefully by records reflecting calendars, other things. Hopefully between Hosey and the U.S. Attorney's Office, we could determine when things occurred, how long they occurred, et cetera, et cetera. We could learn who was there. We could hopefully ask the question what was discussed, because the government in its briefs and bail pending appeal and in two arguments has never once said what actually was discussed in any interview, much less 40 to 50. One question, of course, is why keep interviewing an agent, DeMarco, whether it's two times, whether it's five times, whether it's 20 times. I've been in enough, and I'm sure everyone in this courtroom has been in enough interviews to pick up on what Judge Loewe said, which is that it's odd. And when you have that many, or even a few, stories tend to change. Although, let me put a qualifier on this. If it's two federal agents, for example, and one knows that, and then the government knows that one of those agents is likely to testify for whatever reason, I don't know that there's, that the practice, maybe it ought to be the practice, but I'm not sure that the practice is that the federal agent would then, one federal agent would then be responsible for taking notes of interviews of his or her. But I could address that based on the facts of this case. First of all, we have policies in the U.S. Attorney's Office and the FBI which says otherwise. We also have the fact that Hosey did take notes of other law enforcement officials, and we have the fact that Hosey misrepresented that about his practice at trial. All of those, I think, are fair questions. There's also, at a certain point, the Supreme Court has said there's a presumption that the government has discharged its Brady obligation. Our position is that the facts here at least give rise to a questioning of that presumption. It is very odd. If the court doesn't accept that it's odd to have that many interviews, then I suppose I lose. But it is odd, and the facts of this case play out in a way that we should at least have further inquiry into what exactly happened. Because it is very difficult to cross-examine a witness, much less the key witness, without prior statements and without learning what he said. You have lots of prior statements. No. May I address that? Because I think the court's under a misimpression that somehow DeMarco was taking notes of those interviews. The notes, first of all, the notes which weren't before the district court, but let me accept for this argument that they were there and we'll talk about them, appear to be some sort of post hoc statements by DeMarco trying to figure out when Walsh was out of the office. They do not in any way purport to be DeMarco's notes of his interviews with Hosey. And I would really urge the court not to assume that. So these notes are just prior statements of DeMarco's various, whatever they are, but they're not notes of the conversation. They're not notes of the conversation. I think what he's doing is after the fact, going back to his records and saying, because his theory is when he's out of the office, he's stealing. When the defense comes out, when the evidence comes out pre-trial that there are all these phone calls, the prosecution's theory appears to have to switch, right? Now it can't just be, well, he's out of the office. Now it has to be, he's not allowed, period, because we see that they're talking all the time. And that the defense is now, I can do the work wherever, and that DeMarco specifically authorized me to do that. And there's plenty of evidence to that effect. So what DeMarco says about Walsh's discretion at the outset, what DeMarco says about his conversations with Walsh early on, all go to the question of discretion. And that was really the key part, because they were not winning the case on, I never went golfing. In a hearing, if you were to go back, what would you try to reconstruct? How would you determine that there is in fact Brady when you've got the government telling you that there is no Brady? How do you do that? I think as I was trying to, and maybe I didn't do it clearly in my reply, in my opening rebuttal. We would look to see how many meetings there were, how long those meetings lasted, who else was in those meetings, what was said in those meetings. Why there was a need to keep having meetings if the story didn't change. When they learned about Myrick's statement to DeMarco, and why was that not turned over? Why did Hosey not follow his practice, and then mislead about his practice? I think we could even, I mean there's other factual ways to try to determine what exactly happened. Some of that cross-examination happened at the trial, right? He was confronted with the fact that he did take notes of somebody else, right? And he said, yeah, I guess I did. Right, but the real issue is not so much that. I mean, he did get caught in that at trial. But there's a limitation to how much any defense attorney can ask a cross-examiner and say, well, did you tell the same story 40 times? Yes, I mean, that's not how you cross-examine a witness. The issue is not that Hosey misled. It's the question of why he was misleading. What was there? I don't want to use the word cover up, because that's too strong. But we do want to find out, and again, the government has never said. It never said below. It never said here. It never said in bail pending appeal. It never said today what was in those, why so many, and what was said. And I think it's fair for Ed Walsh to find out what was said. I mean, apart from the question of waiver or forfeiture of the argument, if the thing was even mentioned in the post-trial motions, I'm quite prepared to say the issue is before us. And I just look quickly back at the government's brief. I don't think they even argued forfeiture in their brief. But it's a little hard, it seems to me, to tax the government with not giving a lengthy explanation of something that was not, I think it's fair to say, a significant focus of the post-trial motion. I say, well, they never explained what happened in all of these 50 purported interviews when, in your reply statement here, they got promoted from interviews to meetings. There's nothing that says they were meetings or anything like that. It starts with, how many times did you speak to him? That's the direct question, and he says maybe 40 to 50. And then later, there is the question that uses the word interviews, and he answers the question. I wouldn't even say adopting the word interviews, just not objecting to the questioner's use of the word interview. I would also say, because we didn't even put that in an initial brief, because I think the context of the initial line of questioning, although the word speak is in there, the word interviews is in there a number of times too. I think in the initial briefing, I thought that was sufficient to show that in context, it was interviews, when I went back to file the reply and read other parts of the brief, other parts of the record, I saw that it was more clear, so I certainly highlighted the clean answer. But I don't mean to suggest that this was some sort of, aha, we got you, now you've adopted what we said, although that is in the record. But I do think the full colloquy suggests, look, we could break down whether they were speaking on the telephone sometimes, whether there was meetings sometimes, whether there was interviews sometimes. But I think it's fair to say, based on this record, that there were a number, it appears to be a number of substantive conversations, enough that it should give pause to say, well, wait a minute. Doesn't the defendant deserve to know that? This is the key witness. Mr. Marmer, why don't you, because I did invite you to do it, but you don't have to do anything I ask you to do. But why don't you turn to the cell site location information briefly? Sure. It's always difficult when the Second Circuit issues a decision like Desert Heidi's the day before you file your brief. But I do think that the case is distinguishable, and that is the case where the court, I think, comes closest to deciding the issue about good faith. That was a subpoena case. Ours is not a subpoena case, but for full cell site information there, I believe it was billing records, subscriber information. Ours is obviously much more sensitive. It was also decided before the Jones case. And there's one thing that I think is somewhat interesting, I feel, that we raised in that brief, which is, and courts haven't really focused on this, the oddity of the statute itself, which provides for alternative ways for the government to discharge or to obtain the information. One is, I believe, simply by subpoena, or application for a court order, one is a warrant. And it's an odd way for Congress to draft a statute. It's almost like saying, we recognize there might be a Fourth Amendment problem here, so we'll put that in as a stop gap. And that runs into, as we argue in our brief, the statement in Illinois versus Krull, in which the Supreme Court says, generally, we apply the good faith exception with respect to officers or courts. But there may come a case where we actually say, legislatures would fall under this category, where we may want to encourage legislatures not to pass unconstitutional statutes. Thank you. Vote reserved decision.